UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| BEVERLY ZIMMERMAN, SAMUEL AND SHANNON COLBY, RAYMOND AND ROSALIE ESPINOZA, KEVIN RIGGLE, DEBRA HILTON, and ROCHELLE RADLINSKI, On Behalf of Themselves and All Others Similarly Situated, | Case No. <br><br> Hon. |
| Plaintiffs, <br> v. | CLASS ACTION COMPLAINT |
| THE 3M COMPANY (f/k/a MINNESOTA MINING AND MANUFACTURING CO.), a Delaware Corporation, WOLVERINE WORLD WIDE, INC., a Delaware Corporation, WASTE MANAGEMENT, INC., a Delaware Corporation; and WASTE MANAGEMENT OF MICHIGAN, INC., a Michigan Corporation | DEMAND FOR JURY TRIAL |
| Defendants. | |

## TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................1

II.    PARTIES ...............................................................................................................3

III.   JURISDICTION AND VENUE ...........................................................................6

IV.    GENERAL AND FACTUAL ALLEGATIONS ...................................................6

      A.    3M's Invention and Marketing of Scotchgard™ ......................................6

      B.    3M Knew that Scotchgard™ Contained Persistent, Toxic Chemicals that Were Hazardous to the Environment and Human Health ..................................................8

      C.    Wolverine's History and Use of Scotchgard™ .......................................10

      D.    The Toxic Impact of Scotchgard™ on the Environment and Human Body..............12

          1.   PFAS Chemicals Persist for Thousands of Years.................................12

          2.   PFAS Chemicals Can Stay in the Human Body for Decades After Exposure ....13

          3.   Exposure to PFAS Chemicals Causes Serious Long-Term Health Consequences and Death ..................................................14

      E.    The Contamination of Drinking Water in Kent County Michigan Communities .....18

      F.    Wolverine Knew and Hid that It Had Dumped Toxic PFAS Chemicals in Kent County ..................................................19

V.     CLASS ACTION ALLEGATIONS .....................................................................25

VI.    CAUSES OF ACTION ........................................................................................31

      Count I-Trespass .................................................................................................31

      Count II-Negligence............................................................................................32

      Count III-Private Nuisance .................................................................................34

      Count IV-Public Nuisance ..................................................................................36

      Count V-Product Liability-Defective Design .....................................................39

i

Count VI- Product Liability- Failure to Warn ................................................................40

Count VII-Fraudulent Concealment ...............................................................................41

Count VIII-Battery..........................................................................................................43

Count IX-Unjust Enrichment...........................................................................................44

Count X-Biomedical Monitoring and Blood Serum Testing...........................................46

Count XI- Intentional Infliction of Emotional Distress ..................................................47

Count XII- Negligent Infliction of Emotional Distress ..................................................48

VII.     PRAYER FOR RELIEF ................................................................................................49

VIII.    JURY DEMAND ............................................................................................................51

## <u>CLASS ACTION COMPLAINT AND JURY DEMAND</u>

Beverly Zimmerman, Samuel and Shannon Colby, Raymond and Rosalie Espinoza, Kevin Riggle, Debra Hilton, and Rochelle Radlinski (collectively, "Plaintiffs"), individually and on behalf of others similarly situated, file this Class Action Complaint and Jury Demand against Defendants Wolverine Worldwide, Inc. a/k/a Wolverine Worldwide ("Wolverine"), The 3M Company f/k/a Minnesota Mining and Manufacturing Company) ("3M"), Waste Management, Inc. and Waste Management of Michigan, Inc. (together, "Waste Management"), (collectively, "Defendants"), and state as follows:

## I.    <u>INTRODUCTION</u>

1.      Residents of communities in Kent County, Michigan, including, but not limited to, Belmont, Plainfield Township, and Rockford, recently learned that their drinking water and property have been contaminated by per- and polyfluoroalkyl substances referred to as PFAS.

2.      PFAS were discovered in the drinking water at the Belmont Michigan National Guard Armory. Because the Armory was located less than a mile from a dump site, known as the House Street Dump or Disposal area, that prompted the State of Michigan Department of Environmental Quality ("MDEQ") to conduct further evaluation. So, in the summer of 2017, water testing was expanded to include some nearby Kent County communities. That testing disclosed that PFAS were present in private wells, and PFAS have also been detected in a municipal water supply. Since the initial identification of the problem, new areas of contamination are being identified and the scope of the pollution is expanding dramatically.

3.      PFAS exposure has been associated with many serious health problems, including increased risk of cancer, thyroid disease, high cholesterol, ulcerative colitis, immunological abnormalities, and developmental and reproductive effects.

4.      State officials attribute the contamination in Kent County to Wolverine's dumping of toxic waste, which has entered the local water supply. Wolverine has admitted the dumping.

5.      Wolverine is a footwear manufacturer that treated its products with a water repellent chemical called Scotchgard™, a PFAS-based product that is manufactured by 3M. 3M and Wolverine jointly developed a process to use the product to treat leather.

6.      According to official reports, the sludge and debris from Wolverine's manufacturing facilities and disposal sites in Michigan were allowed to leach into Kent County's ground water, contaminating private wells and possibly municipal water and exposing the residents of the affected Kent County communities to hazardous levels of PFAS.

7.      Wolverine and 3M knew about the contamination and toxicity for years, yet failed to disclose this dangerous problem to the communities and oversight authorities and worse, failed to do anything to stop the dangerous condition from causing injury to individuals and the environment.  Instead, Wolverine and 3M sat silently by as new plumes of toxic chemicals developed, contaminating aquifers beneath private wells and municipal water supplies.

8.      The impact of this silence on both the environment and human health have been catastrophic.  The MDEQ, which has only recently learned of the problem, has already identified at least 75 disposal sites in Kent County that are creating contamination in the affected communities and threatening water supplies, air quality, and human health.

9.      The presence of PFAS in the affected communities' water supplies has stigmatized the communities and adversely impacted, and continues to adversely impact, property values there.

10.      The PFAS contamination has also adversely impacted, and continues to adversely impact, Plaintiffs' and the Class Members' ability to use and enjoy their properties.  It has

2

negatively impacted, and continues to negatively impact, businesses; and has caused, and continues to cause, significant annoyance, inconvenience, hardship, fear and uncertainty among the residents of the affected communities regarding the safety of their water—even for those few individuals who have received temporary filtration systems.  For each of these reasons, as well as those set forth below in further detail, Plaintiffs and Class Members are entitled to compensation under the law and appropriate equitable relief.

11.     Furthermore, the people in these communities have been exposed to PFAS at concentrations well above a safe drinking water level.  These people did not know that they were consuming water contaminated with PFAS until the contamination was disclosed by state officials earlier this year.  Plaintiffs and the Class members are living in fear as to whether they have PFAS in their blood serum.  The exposure to PFAS has placed them at significant risk of developing health conditions linked to PFAS exposure, and they are entitled to know the current level of that exposure.

12.     Plaintiffs bring this action against Defendants for relief from their exposure to toxic chemicals, the contamination of their water supplies, waterways, property, and the environment, and the devaluation of their homes and businesses, caused by Defendants' harmful and defective product, wrongful use and disposal of toxic chemicals during manufacturing activities, maintaining of such disposed chemicals, and knowing concealment of the true danger of PFAS and the breadth of the PFAS contamination in Kent County.

## II.    PARTIES

### *Plaintiffs*

13.     Plaintiff Beverly Zimmerman is a citizen of the state of Michigan, residing in the community of Belmont. Plaintiff learned in October 2017 that her private well had been included

in an expanded test area to the southeast of the House Street Disposal Area or "Dump Site"[1] also identified as the "Southeast Expansion Area."  Thereafter, Wolverine, through its environmental consultant Rose & Westra, Inc., collected a sample of Ms. Zimmerman's private well water for testing. Because of the widespread contamination in Ms. Zimmerman's area, her residential property value has diminished, and she is currently unable to complete refinancing of her home. Ms. Zimmerman owns an additional property in Belmont for investment purposes, the value of which has also decreased due to the contamination.

14.    Plaintiffs Samuel and Shannon Colby are citizens of the state of Michigan, residing in the community of Sparta.  Before moving to Sparta, Mr. Colby was a lifelong resident of Belmont, who lived in areas of contamination, including at a residence on Herrington Street in Belmont, next door to a well which recently tested positive for PFAS chemicals.  Mr. and Mrs. Colby also lived at a residence on Pine Island Court, about half a mile west of a site identified as the House Street Disposal Area, and their son was born during the time they resided there. During their many years in Belmont, Mr. and Mrs. Colby breathed the air, and drank well water as their source of residential drinking water.

15.    Plaintiffs Raymond and Rosalie Espinoza are citizens of the state of Michigan, residing in the community of Belmont. Plaintiffs learned in October that the well at their former residence had been included in a test area to the southwest of the House Street Disposal Area and Wolverine.  They are awaiting test results for their current residence.  Because of the widespread contamination in their area, Mr. and Mrs. Espinoza's residential property value has diminished.

---

[1]  The House Street Disposal area or dump site was located at 1855 House Street NE in Belmont Michigan and it is reported that manufacturing waste and sludge were dumped directly into unlined open dump trenches at the site.

4

16.     Plaintiff Kevin Riggle is a citizen of the state of Michigan, residing in the community of Cedar Springs.  Mr. Riggle owned residential property near an area identified as the South East Expansion Area.  When he owned the home, he breathed the air and drank the well water.

17.     Plaintiff Debra Hilton is a citizen of the state of Michigan, residing in the community of Rockford. Because of the widespread contamination in Ms. Hilton's area, her residential property value has diminished.  She has breathed the air and drank the well water for many years.

18.     Plaintiff Rochelle Radlinski is a citizen of the state of Michigan, residing in the community of Manistee.  Ms. Radlinski formerly resided in an area that is identified as the House Street Disposal area.  When she owned the home, she breathed the air and drank the well water.

### *Defendants*

19.     Defendant 3M is a corporation organized and existing under the laws of the state of Delaware.  Its principal place of business is located at 3M Center, St. Paul, Minnesota 55133.

20.     Defendant Wolverine is a corporation organized and existing under the laws of the state of Delaware.  Its principal place of business is located at 9341 Courtland Drive N.E., Rockford, Michigan 49351.

21.     Defendant, Waste Management, Inc. , is a corporation organized and existing under the laws of the state of Delaware.  Its principal place of business is located at 1001 Fannin Street, Houston, TX 77002.

22. Defendant, Waste Management of Michigan Inc., is a Michigan corporation and a subsidiary of Waste Management, Inc. Upon information and belief, its principal place of business is located in Zeeland, MI.

### III. JURISDICTION AND VENUE

23. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act ("CAFA") 28 U.S.C. §§ 1332(d)(2) and (d)(6), because there is diversity of citizenship and the claims of individual class members, in the aggregate, exceed the jurisdictional minimum of $5,000,000, exclusive of interest and costs.

24. This Court has supplemental jurisdiction over the Plaintiffs' state law claims under 28 U.S.C. § 1367.

25. Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the acts and practices complained of herein occurred in this District.

### IV. GENERAL AND FACTUAL ALLEGATIONS

**A. 3M's Invention and Marketing of Scotchgard ™**

26. 3M, a multinational conglomerate, was founded in 1902 as the Minnesota Mining and Manufacturing Company and merged under the name 3M Company in 2002. It manufactures a broad array of products, including chemicals for residential and commercial use.

27. In the 1950's, 3M developed a product for use in waterproofing, stain proofing, and weather proofing various products, including carpeting, furniture, clothing, and footwear.

28. The product was based on a chemical formula that 3M chemists discovered in 1952 while researching the chemicals for a different application. While experimenting with fluorochemicals that could be used in aircrafts and would be resistant to degradation from jet fuel, the scientists stumbled upon a chemical formula that had durable stain and water repellent

qualities.  This chemical formula, which included - perfluorooctanesulfonamide (PFOSA), a precursor to perfluorooctane sulfonate or PFOS - would catapult 3M to the forefront of the industry in stain and weather proofing various consumer products.

29.     In 1956, 3M began selling its new PFOSA-based product under the name Scotchgard™ Protector ("Scotchgard").

30.     Scotchgard™ breaks down into PFOS, perfluorooctanooic acid (referred to as PFOA) and related per- and polyfluoroalkyl substances, which are a class of man-made chemicals, referred to as PFAS.  Molecules in PFAS contain carbon and fluorine atoms.

31.     PFOS and PFOA are persistent, bioaccumulative, and toxic.

32.     PFAS are used in a wide variety of consumer products to achieve water, oil and stain repellency.

33.     Starting in the mid 1950s and continuing over the next several decades, 3M produced millions of pounds of PFOSA and PFOS, as well as other fluorochemicals and PFAS for use in Scotchgard™.

34.     In 1973, the 3M chemists obtained a patent for the Scotchgard™ chemical compound.

35.     On May 16, 2000, 3M announced in a press release that it would phase out PFOS by the end of 2002 because of concerns over what the company misleadingly claimed was new information that the chemical could contaminate the environment and impact human health.

36.     3M's May 16, 2000 announcement that it would be phasing out perfluorooctanyl chemicals used to produce certain repellents, including Scotchgard™, contained assurances that were false and misleading: "While this chemistry has been used effectively for more than 40

years and our products are safe, our decision to phase out production is based on our principles of responsible environmental management."

37.     In fact, however, 3M made the announcement only after yielding to pressure by the U.S. Environmental Protection Agency ("EPA") to stop manufacturing the PFOS chemical.

38.     That very same day, an EPA internal memorandum revealed a very different set of facts: "PFOS are of significant concern on the basis of evidence of widespread human exposure and indications of toxicity. These chemicals "combine persistence, bio-accumulation, and toxicity properties to an extraordinary degree."

**B.  3M Knew that Scotchgard™ Contained Persistent, Toxic Chemicals that Were Hazardous to the Environment and Human Health**

39.     Upon information and belief, the EPA maintains an administrative record on Scotchgard™ and its PFOSA and PFOS components that spans thousands of pages of data. This administrative record clearly shows that 3M knew its products could accumulate in blood serum as early as 1976.

40.     In fact, 3M began to test for organic fluorines in workers' blood at least as early as 1976, and for PFAS  in blood beginning in 1979, when it quantified levels in the blood of five workers at its Decatur, Alabama, plant.

41.     In 1978, 3M conducted tests that confirmed that perflourinated chemicals or PFAS had been found in the blood of its workers.

42.     In 1980, another 3M study confirmed that C8 is toxic to rats and monkeys. C8 is another name for PFOA and refers to the eight carbon atoms contained in a single molecule of PFOA. The long chain length of the molecule has been implicated in the extreme toxicity of the chemical.

43.     3M did not share the information it discovered with federal or state authorities or agencies until decades later, and, certainly, it never shared the information with the public or the residents of Kent County, including Plaintiffs and the Class Members.

44.     Additionally, more than three decades ago, 3M also knew that perfluorinated chemicals persisted in the human body for long periods of time.

45.     In a 1980 letter to the EPA, 3M's Medical Director detailed an estimated half-life of between 365 and 530 days for perfluorinated chemicals.

46.     In actuality, the half-life is much longer; the elimination half-life of PFOA in humans is roughly estimated to be 3.5 years and for PFOS, approximately 4.8 years.   The deleterious impacts of exposure can last forever.

47.     Around 1983, organic fluorine levels in 3M workers' blood showed a steep increase, and 3M's medical services team sent an internal letter stating: "The test results that were reviewed at our meeting seem to substantiate a trend that has been developing over the past 12-18 months - a tendency for these levels in a number of people to no longer show the previous pattern of decline, in fact, a fair number are now demonstrating an increase in blood fluorine levels." The physician added that, unless the trends change, "we must view this present trend with serious concern. It is certainly possible that . . . exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."

48.     These internal studies were not shared with the public and certainly were never shared with the residents of Kent County, including Plaintiffs and the Class Members.

49.     A 1992 internal 3M study of workers at 3M's Chemolite plant in Cottage Grove, Minnesota, found that ten years of employment in PFOA production was associated with a significant three-fold increase in prostate cancer mortality in men.

50.     Indeed, 3M and E.I. du Pont de nemeurs & Co. ("DuPont"), another producer of perfluoroalkyl substances, had been conducting secret studies and medical tests for decades, the results of which indicated that the components of Scotchgard™ were toxic, bioaccumulative, and could contaminate the environment and human blood.

51.     Despite this, 3M aggressively marketed Scotchgard™, making it a household name, and never publicized its ominous findings that Scotchgard's™ active ingredient had contaminated human blood and was associated with an increased cancer risk based on its own studies, nor did it ever follow up on its findings of PFAS contamination of the environment.

52.     3M has issued false statements that it knows full well are completely inaccurate, as illustrated by its May 16, 2000 press release where it insisted "our products are safe…".

53.     3M waited for decades before agreeing, under threat of regulatory action by the EPA, to report that it had undertaken steps to remove toxic PFAS from its products.

**C.   Wolverine's History and Use of Scotchgard™**

54.     Wolverine manufactures and sells casual shoes, boots, sandals, and related apparel and accessories and owns several popular shoe brands.  Its boot lines include Merrell®, Bates®, HyTest®, Hush Puppies®, Keds®, and Wolverine®. Wolverine's footwear is made under the Cushe brand and private labels. Wolverine also owns several licenses from Caterpillar ("CAT") and Harley-Davidson to make branded footwear.

55.     Wolverine was founded in 1883 in Grand Rapids, Michigan, under the name Hirth-Krause Company, and in 1903, Wolverine built its first factory in Rockford, Michigan. Shortly thereafter, in 1908, Wolverine built a tannery in Rockford to supply the factory.

56.     In 1921, Hirth-Krause and the Rockford Shoe Factory, which had previously merged under the name Michigan Shoe Makers, were united to form Wolverine Shoe and

10

Tanning Corporation.  Wolverine achieved success and efficiency by using readily available pig skin in place of horse hide for leather in its shoe manufacturing process. Wolverine invented pigskin nubock in 1956. However, the leather required chemical treatment in order to achieve the desired qualities of weather resistance and water, oil, and stain repellency. To achieve this, Wolverine collaborated with 3M.

57.     In a statement through its attorney, Wolverine acknowledged Scotchgard™ was first used at the Rockford Tannery in 1958, the same year that Wolverine launched its Hush Puppies® brand.

58.     Upon information and belief, Wolverine used Scotchgard™ on a regular basis as an integral part of its manufacturing processes, treating leather and finished shoes with the chemical in order to weatherproof its products.

59.     Throughout the course of its operations in Rockford, Michigan, both at the tannery and the manufacturing plant, Wolverine engaged in a number of grossly negligent practices including in the disposal and maintenance of toxic waste and sludge, that led to the contamination of the surrounding environment and drinking water with PFAS and other hazardous chemicals.

60.     When certain of its operations ceased, Wolverine remained responsible for the toxic waste that it had dumped, yet it never advised any federal,  state, or local authorities of the existence of the toxic waste, never undertook steps to remediate it, and never informed the public of the toxic hazard lurking under the ground and threatening the water supplies, waterways, air, and human health.

61.     Wolverine's tannery and facilities were located adjacent to the Rogue River and near Rum Creek, a tributary and part of the Rogue River watershed.

62.     Recent tests of sediments from the Rogue River and Rum Creek reveal PFOS levels up to 12,400 parts per trillion (ppt), far in excess of the U.S. EPA Lifetime Health Advisory ("LTHA") of 70 ppt for this chemical.

63.     Monitoring wells on the tannery site have detected PFAS levels at a shocking 490,000 ppt.

64.     Wolverine also owned a dump site in Plainfield Township, Michigan, located at 1855 House Street N.E, where it dumped and maintained its toxic waste.

65.     Wolverine also dumped its toxic wastes at the State Disposal Landfill in Plainfield Township.

66.     Recently, PFAS chemicals have been identified in Plainfield Township's municipal drinking water supply.

67.     Leather and footwear debris, including shoes that were treated with Scotchgard™, containing toxic PFAS, litters Wolverine's property north of Rum Creek and can be found under the adjacent White Pine Trail.

68.     The MDEQ is currently investigating 75 reported sites in Kent County where Wolverine dumped its waste and that are highly likely sources of PFAS contamination and has even asked the public to help it identify any suspected sources of contamination.

**D.  The Toxic Impact of Scotchgard™ on the Environment and Human Body**

**1.      PFAS Chemicals Persist for Thousands of Years**

69.     PFOS, PFOA, and other related PFAS chemicals are environmentally persistent. They do not break down for hundreds, and perhaps thousands, of years. Microbes in the environment do not consume PFAS chemicals.

70.     PFAS chemicals are thermally, chemically, and biologically stable and resistant to biodegradation, atmospheric oxidation by light, direct photolysis, and hydrolysis.

71.     PFAS chemicals cannot be removed by boiling water or by treating the water with chlorine or other disinfectant chemicals, which are typically used in public drinking water systems.

72.     Due to their chemical structure, PFAS are particularly persistent in water and soil; and because PFAS are water-soluble, they can migrate readily from soil to groundwater.  PFAS, in short, remain present in the environment long after they are initially discharged.

73.     PFOA, PFOS, and other PFAS chemicals can leach through soil and are mobile in the environment, allowing them to pollute ground and surface water and the surrounding environment.  Their vapors are also carried in the air, causing widespread contamination and public health issues from inhalation.

74.     PFOS, PFOA, and other PFAS chemicals can contaminate water systems, causing oxygen deprivation, fish kills, and human exposure to high levels of these toxic chemicals when they consume contaminated fish, game, or water.

75.     It is the persistence in the environment that mandates a polluter must take action to remediate the discharge and migration of toxic PFAS.

**2.      PFAS Chemicals Can Stay in the Human Body for Decades After Exposure**

76.     Toxicology studies show that PFAS are readily absorbed after ingestion or inhalation exposure.

77.     PFAS and related chemicals bioaccumulate in the tissue of living organisms, including humans. Humans consume these chemicals at a rate much faster than they can excrete

them. Once they enter the human body, it takes a very long time to get rid of PFAS and related chemicals. The impact of the exposure can last forever and be fatal.

78.     The half-life of long-chain PFAS in the human body is between two to nine years. PFAS binds to albumen in the serum and is concentrated in the liver and kidneys.  So, if a human being consumed a quantity of PFAS on a given date, it would take two to nine years to excrete half of that quantity. That means that it takes about nine half-lives to excrete all of that quantity, a total of between 21 and 49 years.

79.     Unfortunately, when humans absorb or consume PFAS from their drinking water, they are doing so on a daily basis, but it takes 21 to 49 years to completely rid the body of the PFAS that are consumed each day. The bio-accumulation of toxic PFAS is, therefore, a problem of frightening proportions.

80.     PFOS, PFOA, and related PFAS chemicals are readily absorbed in the human body and accumulate primarily in the blood serum, kidney, and liver.

81.     These chemicals can be passed from mother to infant through breastfeeding and through the umbilical cord in utero.

### 3.     Exposure to PFAS Chemicals Causes Serious Long-Term Health Consequences and Death

82.     There are numerous health risks associated with exposure to PFAS chemicals, and these risks exist even when the chemical is ingested or absorbed at purportedly low levels, such as less than 1.0 parts per billion (ppb).

83.     PFAS are associated with increased risk in humans of testicular cancer, kidney cancer, prostate cancer, non-Hodgkin's lymphoma, pancreatic cancer, ovarian cancer, thyroid disease, high cholesterol, high uric acid levels, elevated liver enzymes, ulcerative colitis, and pregnancy-induced hypertension, as well as other conditions.

14

84.     Epidemiological studies of PFAS exposure in animals have shown PFAS have the ability to cause other cancers not yet associated with human exposure.

85.     The EPA has also advised that exposure to PFAS may result in developmental effects to fetuses during pregnancy or to breastfed infants, liver damage, and various immunological effects.

86.     Other studies in the United States and across the world have linked PFAS exposure to the following conditions, among others:

    a.  cerebrovascular disease;

    b.  increased diabetes mortality;

    c.  immunologic abnormalities including, but not limited to, reduced immunologic response to vaccines by children, immune system suppression, and abnormal allergic responses;

    d.  thyroid disorders and disease;

    e.  liver disorders and disease;

    f.  hormonal abnormalities;

    g.  developmental and reproductive effects;

    h.  neurological effects;

    i.  increased risk of pancreatitis and pancreatic cancer; and

    j.  increased osteoarthritis.

87.     PFOS and PFOA have also been reported as causing tumors in animal studies.

88.     Findings from human epidemiology studies conducted as a result of exposures similar to those of these Plaintiffs and Class Members showed increased cholesterol levels

among exposed populations, with other findings related to: low infant birth weights, effects on the immune system, cancer (for PFOA), and thyroid hormone disruption (for PFOS).

89.     In 2005, an Environmental Working Group analysis of PFOA, done according to the EPA's internal guidelines for assessing the cancer potential of a chemical, found that PFOA is a "likely" human carcinogen. This categorization of "likely carcinogen" requires that just one of five EPA cancer criteria is met.  The analysis concluded that the chemical met ***three of the five*** criteria. PFAS have been linked to multiple cancers in male and female mice in more than one study of types of tumors that are statistically significant and assumed to be relevant for humans.

90.     A study relating to PFOA contamination resulting from toxic contamination from a DuPont chemical  plant, called the C8 Health Project, was conducted to report on the health effects of elevated PFOA in the human body arising from exposures similar to those of Plaintiffs and the Class Members. From 2005-2013, the C8 Science Panel carried out exposure and health studies in the impacted Mid-Ohio Valley communities. The C8 Health Project gathered information through interviews and questionnaires and collected blood samples from about 69,000 people living near a plant that produced PFOA in West Virginia or near a landfill or dump site in the Ohio River Valley. The C8 Science Panel concluded that there was a "probable link" between PFOA exposure and testicular cancer, kidney cancer, thyroid disease, ulcerative colitis, high cholesterol, and pregnancy-induced hypertension.

91.     In May 2006, the EPA Science Advisory Board stated that PFAS cancer data are consistent with guidelines suggesting exposure to the chemical is "likely to be carcinogenic to humans."

92.     Significantly, the health conditions set forth above can arise months or years after exposure to PFAS.

93.     In June of 2016, a peer-review panel of scientists, including epidemiologists, toxicologists, and microbiologists, concurred with the U.S. Department of Health and Human Services National Toxicology Program's finding that PFOS and PFOA can harm the human immune system.

94.     In 2009, the EPA established provisional health advisories ("PHAs") for PFOA at 0.4 ppb (parts per billion) and PFOS at 0.2 ppb.  PHAs are developed to provide information in response to an urgent or rapidly developing situation that could impact human health. They are guidelines to reduce exposure to unregulated contaminants in drinking water.

95.     In 2012, the EPA included PFOS and PFOA in its Third Unregulated Contaminant Monitoring Rule ("UCMR3"). The Unregulated Contaminant Monitoring program is a mechanism prescribed under the 1996 Safe Drinking Water Act that requires the EPA to issue a new list of no more than 30 unregulated contaminants to be monitored by public water systems (PWSs) every five years.

96.     When UCMR3 was issued, the EPA required certain drinking water providers across the United States to test their water for PFOS and PFOA and report the results.

97.     In May 2016, the EPA established Lifetime Health Advisories ("LTHA") for both PFOS and PFOA. The LTHA set a level of PFOS and PFOA in drinking water to a ***combined*** concentration of 0.07 ppb or 70 ppt.  However, these levels are highly contested, and some states have set much lower levels for these chemicals. For example, in November of 2017, the state of New Jersey set a maximum contaminant level of 14 ppt for PFOA in drinking water, as

recommended by the New Jersey Drinking Water Institute. The state of Vermont set a level of 20 ppt for PFOA and PFOS in drinking water.

98.     Dr. Philippe Grandjean, M.D., currently a Professor of Environmental Health at Harvard University's T.H. Chan School of Public Health, has conducted extensive research on PFAS chemicals and human health, and he recommends a maximum concentration level of *1 ppt* for these chemicals.

**E.  The Contamination of Drinking Water in the Kent County Michigan Communities**

99.     Recent data shows that the wells providing drinking water for homes around Wolverine's former dump sites in Kent County have tested positive for PFAS chemicals.

100.    Testing is underway for more wells and properties in the area surrounding the former Wolverine tannery, and it is inevitable that the testing will reveal widespread contamination, due to the persistent and mobile nature of PFAS chemicals.

101.    Monitoring of wells on the Wolverine tannery site and tests of sediments in the Rogue River and Rum Creek have all revealed PFAS contamination.

102.    On September 8, 2017, the Health Department of Kent County, Michigan issued a News Release stating that "potentially toxic" chemicals had been found in Belmont well water.

103.    Upon detection of PFAS contamination of residential wells surrounding the House Street Disposal site, the MDEQ designated an area of homes near the site, and Wolverine began testing the private wells of homes located in that area. This original zone of testing has been referred to as the House Street disposal site.

104.    On October 18, 2017, the MDEQ announced that it was expanding testing of private drinking water wells located to the southeast of the current House Street Disposal Area. Called the "Southeast Expansion Area."  This expansion area includes an additional 300 homes.

105.    Residents around Wolverine's former tannery, factory, and dump sites are reeling from learning that Defendants have exposed them to toxic PFAS chemicals.

106.    After the disclosure by state and local government investigations in the Fall of 2017 that widespread PFAS contamination existed, the home and property values in the affected and nearby zones have declined and will continue to drop further as news of the contamination spreads.

## F.  Wolverine Knew and Hid that It Had Dumped Toxic PFAS Chemicals in Kent County

107.    Wolverine dumped its tannery and manufacturing waste at various locations throughout Kent County. Upon information and belief, this waste included sludge and waste from the manufacturing and tannery processes, chemicals, and leather and footwear scraps, all of which were contaminated with PFAS chemicals. Information regarding the specific locations of the multiple Wolverine waste disposal sites is still emerging. Indeed, the MDEQ has requested that residents report suspected dump sites throughout the community.

108.    Defendants' employees, at the direction and/or with the approval of corporate officers, washed out and discharged the remaining PFAS solution on a daily basis, resulting in discharge into the soil and nearby waterways.

109.    Defendants' employees, at the direction and/or with the approval of corporate officers, dumped the sludge and toxic waste at various landfills and other sites throughout Kent County.

110.    Upon information and belief, Wolverine tannery and manufacturing waste was deposited in various locations around Kent County, including, but not limited to:

    a.  The State Disposal Landfill, located at 3954 E. Beltline Ave. NE in Plainfield Township. The landfill is owned by Waste Management;

b.   a gravel pit at the Northeast Gravel Co., which has since been redeveloped into the Boulder Creek Golf Club at 5750 Brewer Ave. NE in Belmont;

c.   the House Street Dump in Plainfield Township;

d.   an area in the vicinity of White Pine Trail at 4400 12 Mile Road NE in Algoma Township;

e.   the Butterworth Landfill at 1450 Butterworth St. SW in Grand Rapids;

f.   the Rogue River and Rum Creek where waste and debris from the tannery were deposited;

g.   Rezen Drive and Rezen Court NE in Rockford, MI 49341; and

h.   a farm near 14 Mile Road and Northland Drive NE, which has been identified as another potential dump site.

111.   These sites were not monitored or maintained properly to prevent contaminating the environment and posing human exposures.

112.   As investigations in Kent County continue, and as discovery commences, more sites and methods of discharge will undoubtedly be identified.

113.   Wolverine also disposed of its manufacturing and tannery waste at the House Street Dump, an unlined dump located at 1855 House Street N.E. in Belmont, Michigan. Upon information and belief, tannery and manufacturing waste and sludge were dumped directly into unlined open dump trenches at the dump site.

114.   Upon information and belief, Wolverine also dumped tannery and manufacturing waste directly into the Rogue River and Rum Creek, as evidenced by the presence of identifiable footwear debris in mud flats in the Rogue River, locally termed "the Island of Lost Soles" and the presence of PFAS chemicals in the sediments of the Rogue River and Rum Creek.

115.    Wolverine has known that it dumped persistent and toxic PFAS chemicals at various sites around Kent County, yet it did not notify residents, including Plaintiffs and the Class Members of the risk, including migration.  It also failed to remediate the environmental contamination and to address the severe public health impacts.  Instead, it willfully, wantonly, and recklessly hid the truth.

116.    3M knew or should have known that its toxic chemicals were disposed of at various sites in Kent County, yet it did not notify residents including Plaintiffs and the Class Members of the risk, including migration.  It also failed to remediate the environmental contamination and to address the severe public health impacts.  Instead, it willfully, wantonly, and recklessly hid the truth.

117.    Waste Management owns and operates the State Disposal Landfill and failed to properly maintain the landfill so that toxic chemicals would not reach aquifers and water supplies for consumption in drinking water or be released into the air.  Waste Management also failed to remediate the environmental contamination and to address the severe public health impacts.

118.    Defendants allowed new adverse effects to develop as the plumes expanded, contaminating more homes and drinking water resources and contaminating the air and environment.

119.    3M was also aware that it was manufacturing chemicals to be used in the manufacture of shoes that would create toxic waste; yet it did nothing.

120.    In addition, 3M specifically raised the issue of Scotchgard's™ safety with Wolverine in a letter dated January 15, 1999,"[W]e trust that you appreciate the delicate nature of this information and its potential for misuse. We ask that you treat it accordingly."

121.    Defendants continued to knowingly, and recklessly manufacture, supply, sell, use, dispose of, and maintain Scotchgard™ and the products treated with Scotchgard™ and failed to consider the safety of the environment or the health of the citizens of Kent County, and failed to notify any public authorities or citizens, and failed to take any steps to clean up or contain the toxic waste materials that had already been dumped.

122.    Defendants knowingly, intentionally, and/or recklessly misrepresented material facts concerning the safety of, and risks posed by Scotchgard™ and the contaminated waste from Wolverine's manufacturing operations.

123.    Indeed, Defendants knowingly allowed the toxic and unlawfully dumped waste to leach into the environment and groundwater for years, without regard for the health and environmental impacts, including on the water supply.

124.    On May 30, 2017, the U.S. government conducted an investigation at the Michigan Army National Guard's Belmont Armory, which detected the presence of PFOS in the ground water. Because the Armory is located less than a mile from the House Street Dump, the findings in May of 2017 prompted the MDEQ to require testing of residential drinking water wells along the south side of the dump in August of 2017; and the Wolverine catastrophe began to emerge.

125.    Plaintiffs and the Class Members were never informed of the hazards posed by Wolverine's PFAS-contaminated waste until, at the earliest, the Fall of 2017 when state environmental authorities began to get involved in testing PFAS contamination of residential wells and test results were released, showing shockingly elevated levels of PFAS. Had Defendants disclosed the existence of this contamination earlier, Plaintiffs and the Class

Members would have curtailed their consumption of contaminated water and prevented their families and children from being exposed to such contamination.

126.    Large amounts of PFAS remain today throughout these Kent County communities.

127.    As a result of Defendants' disposal and failure to properly remediate the PFAS contamination, Plaintiffs and the Class Members are at risk of developing serious latent disease and other adverse medical conditions; and, as a result, are also suffering emotional distress.

128.    The ongoing presence of PFAS contamination has impacted Plaintiffs and the Class Members' properties, is a blight on the affected communities and deprives Plaintiffs and Class Members of their free use and enjoyment of their property.

129.    Defendants deliberately concealed this information from the authorities and the Plaintiffs and the Class Members.

130.    Defendants also failed to notify relevant authorities in 2004, when seven new homes were approved for construction near the House Street Dump, and new wells were constructed to supply drinking water.

131.    Defendants continued to sell the Scotchgard™ and footwear at great financial benefit to themselves.

132.    Defendants continued to avoid the cost of environmental clean-up and lawsuits by failing to disclose the problem to the authorities and the Plaintiffs and the Class Members.

133.    As a result, Plaintiffs and the Class Members have been exposed to toxic PFAS chemicals, contamination of their properties, the environment, air, drinking water and contaminations to be identified.

134.   Defendants concealed material facts from the authorities and the Plaintiffs and the Class Members.

135.   Defendants failed to disclose the toxic nature of their manufacturing operations and products and waste.

136.   Defendants knew that the products were toxic and posed a risk to the environment and to human health, but failed to take any steps or corrective action or to notify the authorities or the Plaintiffs and the Class Members.

137.   Defendants knew that the public, and specifically, the authorities, the Plaintiffs and the Class Members relied on the Defendants to conduct proper disposal of their products, and especially toxic chemicals.

138.   Defendants knew that the public, and specifically, the authorities, the Plaintiffs and the Class Members relied on the Defendants to properly maintain any toxic waste sites where they had disposed of contaminated waste and to notify the proper authorities and parties and the public of any dangers and risks.

139.   Plaintiffs and the Class Members could not have discovered Defendants' concealment and misconduct until recently.

140.   Defendants recognized that they may be liable for any claims associated with the contamination that they caused and were, accordingly, incentivized to hide the catastrophe that they had caused and their liability for same.

141.   Defendants fraudulently concealed the existence of their bad acts and the claims against Defendants, so that the authorities, the Plaintiffs, and the Class Members could not discover the existence of the claims.

142.    Defendants' concealment was intended to keep the authorities, Plaintiffs, and the Class Members from discovering their misconduct and the resultant damages with the obvious intention of avoiding the costs of litigation and any damages.

## V.    CLASS ACTION ALLEGATIONS

143.    All allegations and preceding paragraphs are incorporated herein by reference. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of a class of all other persons similarly situated as members of the proposed classes and/or Class.

144.    Plaintiffs propose to represent the following classes (collectively referred to within this Complaint as the "Class"):

a.  **Private Well Water Property Damage Class:**  All individuals who, are or were owners of real property located in areas contaminated by dumping and manufacturing activities arising from the operation of Wolverine World Wide and who obtain or obtained their drinking water from a privately owned well.

b.  **Municipal Water Property Damage Class:**  All individuals who, are or were owners of real property located in areas contaminated by dumping and manufacturing activities arising from the operation of Wolverine World Wide and who obtain or obtained their drinking water from a contaminated municipal source.

c.  **Private Well Water Nuisance Class:**  All individuals who, are or were owners of real property located in areas contaminated by dumping and manufacturing activities arising from the operation of Wolverine World Wide and who obtain or obtained their drinking water from a privately owned well.

d.  **Municipal Water Nuisance Class:**  All individuals who, are or were owners of real property located in areas contaminated by dumping and manufacturing activities arising from the operation of Wolverine World Wide and who obtain or obtained their drinking water from a contaminated municipal source.

e.  **Blood Serum Testing Class**:  All individuals who, as of the time a class is certified in this case, have ingested PFAS-contaminated water from the municipal water supply or from a contaminated private well in or around the Kent County areas and who have been exposed to a possible accumulation of PFAS in their bodies.

f. **Biomonitoring Class:**  All individuals who, as of the time a class is certified in this case, have ingested PFOA-contaminated water from the municipal water supply or from a contaminated private well in or around the Kent County communities and who have suffered accumulation of PFAS in their bodies as demonstrated by (i) blood serum tests disclosing a PFAS level in their blood above the recognized background levels, or (ii) documentation of an increased opportunity for exposure, as defined in ASTDR's Final Criteria for Determining the Appropriateness of a Medical monitoring Program Under CERCLA.[2]

145.    Excluded from the Class are: (a) Defendants and any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (b) the Judge to whom this case is assigned and the Judge's staff; (c) the attorneys representing any parties to this Class Action; (d) any State or any of its agencies; and (e) the cities, towns, counties, townships, municipalities, and government entities of Kent County.

146.    Plaintiffs reserve the right to amend the class definitions set forth above if discovery and/or further investigation reveals that any class should be expanded, divided into a subclass or modified in any way.

147.    The Class satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Fed. R. Civ. P. 23.

## Numerosity

148.    The exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, however, the number is great enough that joinder is impracticable.  The MDEQ is already investigating over 75 areas of possible dumping activities, which reach into communities with 100's of private homes.  Each of the classes set forth above is sufficiently numerous to warrant class treatment and the disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court.

---

[2] *See* ATSDR'S Final Criteria for Determining the Appropriateness of A Medical Monitoring Program Under CERCLA, https://www.gpo.gov/fdsys/pkg/FR-1995-07-28/pdf/95-18578.pdf.

149.    Further, Class Members will be readily identifiable from publicly available information regarding property ownership and/or residential history.

## Typicality and Commonality

150.    Plaintiffs' claims are typical of the claims of the Classes as all are based on the same legal and remedial theories arising from exposure to toxic PFAS chemicals and to diminution in property value and/or nuisance from the actions of Defendants.  Plaintiffs also have been exposed to drinking water contaminated with PFAS.

151.    All members of the Class are similarly affected by Defendants' conduct resulting in injury to all members of the Class by causing them to be exposed to unsafe levels of dangerous PFAS resulting in diminished property values and environmental harm.

152.    The factual bases of Defendants' misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all members of the classes.

## Adequate Representation

153.    Plaintiffs will fairly and adequately protect the interests of all Class Members in the prosecution of this action and in the administration of all matters relating to claims stated herein.  Plaintiffs are similarly situated with, and have suffered similar, if not identical, injuries as the members of the class whom Plaintiffs seek to represent.

154.    Plaintiffs wish to obtain redress of such wrongs, and want Defendants enjoined from perpetrating similar wrongs on others.  To that end, Plaintiffs have retained counsel experienced in handling class action suits.  Neither the named Plaintiffs nor Plaintiffs' counsel have any interest, conflicting or otherwise, which might cause them not to vigorously pursue this action.

## Predominance of Common Questions

155.    There are questions of law and fact which are common to all Class Members, which questions predominate over any question affecting only individual Class Members.  The answers to these common questions will advance resolution of the litigation as to all Class Members.  The common legal and factual issues include:

a.  Whether Defendants owed a duty to Plaintiffs and the Class Members, to refrain from conduct reasonably likely to cause contamination of Class Members' drinking water;

b.  Whether Defendants breached that duty;

c.  Whether Defendants knew or should have known that Scotchgard™ contained toxic, persistent, mobile, and dangerous chemicals that were likely to contaminate the environment, groundwater, and drinking water;

d.  Whether Defendants failed to sufficiently warn purchasers and users of Scotchgard™ of the harm that could and did result from exposure to its toxic components;

e.  Whether Defendants negligently or intentionally exposed Plaintiffs and the Class Members to hazardous PFAS chemicals;

f.  Whether Defendants became aware of the imminent environmental threat posed by Scotchgard™ and failed to warn Plaintiffs and the Class Members, notify authorities, and take appropriate remedial action; and

g.  Whether Plaintiffs and the Class Members have suffered damages as a result of Defendants' actions.

## Superiority

156.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

157.    Furthermore, as the damages suffered by individual Class Members may be relatively small, and the expense and burden of individual litigation render it impossible for members of the Class to individually redress the wrongs done to them.

158.    Class treatment of common questions of law and fact will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

159.    There will be no difficulty in the management of this action as a class action.

160.    Proper and sufficient notice of this action may be provided to the Class Members through the mail, notice published in appropriate publications and/or broadcast in appropriate media, and/or posted on Defendants' internet web site(s).

161.    Plaintiffs and the members of the class have suffered damages as a result of Defendants' wrongful conduct as alleged herein, and are entitled to recover for those damages. Absent representative action, Plaintiffs and the Class Members will continue to suffer losses, thereby allowing these violations of law to proceed without remedy.

## Rule 23(b)(2) – Injunctive or Declaratory Relief

162.    In addition to the allegations set forth and the relief requested above and below, Plaintiffs and the Class Members bring this action under Rule 23(b)(2) because Defendants have acted or refuse to act on grounds that apply generally and universally to Plaintiffs and the Class Members as a whole, making final injunctive relief proper with respect to the Class as a whole.

163.    Proper injunctive relief includes, but is not limited to:

a. an injunction to require the implementation and funding of a medical monitoring program, including a blood serum testing program, to test for the presence of PFAS in the Plaintiffs' and Class Members' blood serum;

b. an injunction to require the provision of appropriate medical screenings to protect and monitor Plaintiffs' and the Class Members' health and account for Plaintiffs' and the Class Members' increased risk of disease due to PFAS exposure;

c. an injunction to require continued regular monitoring and reporting of Plaintiffs' and the Class Members' drinking water to ensure that their potable water remains safe, even as the PFAS plumes continue to migrate and expand through the environment; and

d. an injunction to require thorough cleanup and remediation of the PFAS contamination in the environment, including, but not limited to, Plaintiffs' land, groundwater, and wells, as well as Wolverine's property, Rum Creek, and the Rogue River.

**RULE 23(c)(4) – Certification of Particular Issues**

164. In the alternative to certification under Rule 23(b)(2) or 23(b)(3), Plaintiffs and the Class Members seek to maintain this class action with regard to particular issues under Rule 23(c)(4).

165. The adjudication of each Defendant's liability involves issues and questions of fact and law that are common and universal to the entire Class, therefore, certification under Rule 23(c)(4) is proper.

## VI.      CAUSES OF ACTION

### COUNT I - TRESPASS

166.    All allegations and preceding paragraphs are incorporated herein by reference as if fully set forth herein.

167.    Class Members are the owners of property located adjacent to, or in the vicinity of, sources of chemical contamination from Wolverine's manufacturing and tannery waste, including, but not limited to landfills, gravel pits, trenches, public and private property, water ways, and other dump sites.

168.    Class Members have a legal right to the use and enjoyment of their property, which includes, among others, a right to safely use the drinking water wells on their property, and a right to use their land to raise animals and grow food.

169.    Defendants trespassed on the lands of the Class Members by causing PFAS to contaminate the property of the Property Owner Subclass members, including but not limited to, contamination by particulates, air contaminants, and invasion of the water supply.

170.    Defendants' trespass was intentional, willful, wanton, and with reckless disregard.

171.    Defendants' trespass was unauthorized.

172.    Defendants' contamination of the Property Owner Subclass Members' private lands invaded their property and intruded upon their property interests, including their use and enjoyment of their property.

173.    As a direct and proximate result of Defendants' trespass, Class Members are damaged.

174.    Class Members are entitled to a recovery for Defendants' trespass as set forth below.

## COUNT II - NEGLIGENCE

175.    All allegations and preceding paragraphs are incorporated herein by reference as if fully set forth herein.

176.    Defendants knew or should have known that the use of PFAS and/or Scotchgard™ and/or the discharge of PFAS into the air, ground and sewer system was potentially hazardous to human health and the environment and required Defendants to take adequate safety precautions to ensure that the PFAS were not released into the surrounding environment.

177.    Defendants knew or should have known that the use of PFAS and/or the discharge of PFAS into the ground and sewer systems surrounding the tannery, manufacturing facility, and dump sites, as well as the adjacent river and river banks was unreasonably dangerous.

178.    Defendants knew or should have known that Scotchgard™ is dangerous to human health and that its components cause or contribute to a variety of diseases and disorders.

179.    Defendants owed a duty to Plaintiffs and the Class Members to manufacture, develop, test, market, sell, use, label, and/or dispose of and maintain Scotchgard™ and its waste and sludge in a manner that would prevent and avoid harm to those who would use and/or come into contact with it.

180.    Defendants also had a duty to instruct, promulgate rules and guidelines, and/or train their personnel on the use, handling and disposal of Scotchgard™ and all materials treated with Scotchgard™ to ensure that Plaintiffs, the Class Members and the environment would not be exposed and contaminated by dangerous PFAS chemicals.

181.    Defendants had a duty to ensure that the manufacturing processes they chose to employ did not unreasonably endanger the drinking water relief upon by the residents of these Kent County communities.

182. Defendants had a duty to take all reasonable measures to ensure that PFAS and Scotchgard™ residue would be effectively contained and not discharged into the surrounding environment.

183. Defendants also had a duty to properly maintain their toxic waste.

184. Defendants had a duty to disclose of the toxic nature of their products and the waste that it was dumping and maintaining.

185. Defendants breached the above-stated duties by unreasonably disposing of PFAS solution and the products treated with Scotchgard™ in a manner that guaranteed that PFAS would enter the environment, including the groundwater and the air.

186. As a result of Defendants' breaches, the drinking water and waterways in and around these Kent County communities have become contaminated with unsafe levels of PFAS.

187. Indeed, Defendants, through the negligent, reckless and/or intentional acts and omissions alleged herein, have contaminated the municipal water system of at least one community and the drinking water of private wells, the rivers, and wildlife, including fish, in these Kent County communities.

188. These unsafe levels of PFAS have deprived and continue to deprive Plaintiffs and the Class Members of potable water and have reduced Class Members' property values.

189. Further, by exposing Plaintiffs and the Class Members to unsafe levels of PFAS, Defendants have caused and continue to cause Plaintiffs and the Class Members to suffer injury and damage.

190. If Defendants had not breached their duties, the contamination of Plaintiffs' and the Class Members' property and drinking water would not have occurred.

191. The harm caused by Defendants' actions was reasonably foreseeable.

192.    As a direct and proximate result of Defendants' breaches of their duties, the Plaintiffs and the Class Members were harmed and suffer damages, including the fear of PFAS in their bodies; the loss of property value; monetary damages associated with the monitoring and remediation of drinking water and the contamination of their respective property; as well as compensatory and consequential damages as set forth below.

## COUNT III – PRIVATE NUISANCE

193.    All allegations and preceding paragraphs are incorporated herein by reference as if fully stated herein.

194.    Defendants, through the negligent, reckless and/or intentional acts and omissions alleged herein, have contaminated the drinking water and waterways of these Kent County communities.

195.    In the operation of the Wolverine facilities, the disposal of its toxic waste, and the maintenance of its toxic disposals, Defendants utilized and generated toxic substances, including PFAS.

196.    In the operation of the Wolverine facilities, the disposal of its toxic waste, and its ongoing maintenance of its toxic disposals, Defendants discharged fallout, odors, chemicals, and toxic substances into the air and groundwater and into the Plaintiffs' and Class Members' homes.

197.    These toxic substances are invasive and have caused damage to Plaintiffs' and the Class Members' personal and real property and health.

198.    Defendants had a duty to prevent the discharge of toxic chemicals onto Plaintiffs' and the Class Members' properties and to prevent the toxic chemicals from escaping from the disposal sites onto the Plaintiffs' and the Class Members' property and into their drinking water.

199.    Plaintiffs and the Class Members did not consent for the toxic chemicals to physically invade their personal and real property.

200.    Plaintiffs and the Class Members have a right to the use and enjoyment of their property, including, but not limited to, their drinking water wells established on their properties.

201.    Defendants owed a duty to proceed with all reasonable and necessary care to prevent Plaintiffs' and the Class Members' property from becoming contaminated with dangerous PFAS chemicals.

202.    Defendants' wrongful actions in causing PFAS chemicals to contaminate property and drinking water created a substantial interference with the use and enjoyment of, and physical harm to, the property of Plaintiffs and the Class Members.

203.    The contamination of Plaintiffs' and Class Members' drinking water has interfered with the rights of Plaintiffs and Class Members to use and enjoy their property. Indeed, this interference is substantial in nature.  It has caused Plaintiffs and the Class Members to, *inter alia,* refrain from using water to drink, cook or bathe, which has, in turn, caused significant inconvenience and expense, as well as anxiety and emotional distress.

204.    Defendants' conduct has also substantially interfered with Plaintiffs and the Class Members' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that each Class Member so chooses.

205.    Defendants' negligent, reckless and/or intentional acts and omissions and acts of interference with Plaintiffs' and the Class Members' use and enjoyment of their property were substantial and unreasonable.

206.    Defendants' substantial and unreasonable interference with Plaintiffs' and the Class Members' use and enjoyment of their property constitutes a nuisance for which Defendants are liable to Plaintiffs and the Class Members for all damages arising from the nuisance.

207.    As a direct and proximate result of the Defendants' wrongful and intentional acts and omissions as alleged herein, Plaintiffs and the Class Members have incurred, and will continue to incur costs and expenses related to the investigation treatment, remediation, and monitoring of drinking water and the contamination of their respective properties, as well as the damages set forth below, including emotional distress.

## COUNT IV – PUBLIC NUISANCE

208.    All allegations and preceding paragraphs are incorporated herein by reference as if fully stated herein.

209.    Plaintiffs and the Class Members, as members of the general public, have a right to safe drinking water and to live in a safe environment where toxic chemicals do not threaten their health or interfere with their use and enjoyment of the environment.

210.    Defendants have unreasonably interfered with the rights of Plaintiffs and the Class Members by causing the environment in which Plaintiffs and the Class Members live, including their drinking water, to become contaminated with toxic and dangerous PFAS.

211.    Defendants' wrongful actions in causing PFAS contamination have significantly interfered with the public's health, safety, peace, comfort, and/or convenience.

212.    Defendants knew, or should have known, that their wrongful conduct in repeatedly and systematically causing, contributing to, and exacerbating the PFAS contamination would and has produced a permanent or long-lasting infringement on public rights.

213.    Plaintiffs' and the Class Members' damages as a result of Defendants' conduct are of a special character and distinct from those suffered by the general public because Plaintiffs and the Class Members have actually been exposed to unsafe PFAS chemicals through consumption and/or absorption and/or inhalation.

214.    Defendants, through the negligent, reckless and/or intentional acts and omissions alleged herein, have contaminated the drinking water and waterways of these Kent County communities.

215.    In the operation of the Wolverine facilities, the disposal of its toxic waste, maintenance of its toxic disposals, Defendants utilized and generated toxic substances, including PFAS.

216.    In the operation of the Wolverine facilities, the disposal of its toxic waste, and its ongoing maintenance of its toxic disposals, Defendants discharged fallout, odors, chemicals, and toxic substances into the air and groundwater and into the environment.

217.    These toxic substances are invasive and have caused damage to Plaintiffs' and the Class Members' personal and real property and health.

218.    Defendants had a duty to prevent the discharge of toxic chemicals onto Plaintiffs' and the Class Members' properties and to prevent the toxic chemicals from escaping from the disposal sites onto the Plaintiffs' and the Class Members' property and into their drinking water.

219.    Plaintiffs and the Class Members did not consent for the toxic chemicals to physically invade their personal and real property.

220.    Plaintiffs and the Class Members have a right to the use and enjoyment of their property, including, but not limited to, their drinking water wells established on their properties.

221. Defendants owed a duty to proceed with all reasonable and necessary care to prevent Plaintiffs' and the Class Members' property and the environment from becoming contaminated with dangerous PFAS chemicals.

222. Defendants' wrongful actions in causing PFAS chemicals to contaminate property and drinking water created a substantial interference with the use and enjoyment of, and physical harm to, the property of Plaintiffs and the Class Members.

223. The contamination of Plaintiffs' and Class Members' drinking water has interfered with the rights of Plaintiffs and Class Members to use and enjoy their property. Indeed, this interference is substantial in nature. It has caused Plaintiffs and the Class Members to, *inter alia,* refrain from using water to drink, cook or bathe, which has, in turn, caused significant inconvenience and expense, as well as anxiety and emotional distress.

224. Defendants' conduct has also substantially interfered with Plaintiffs' and the Class Members' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that each Class Member so chooses.

225. Defendants' negligent, reckless and/or intentional acts and omissions and acts of interference with Plaintiffs' and the Class Members' use and enjoyment of their property were substantial and unreasonable.

226. Defendants' substantial and unreasonable interference with Plaintiffs' and Class Members' use and enjoyment of their property constitutes a nuisance for which Defendants are liable to Plaintiffs and the Class Members for all damages arising from the nuisance.

227. As a direct and proximate result of the Defendants' wrongful and intentional acts and omissions as alleged herein, Plaintiffs and the Class Members have incurred, and will

38

continue to incur costs and expenses related to the investigation treatment, remediation, and monitoring of drinking water and the contamination of their respective properties, as well as the damages set forth below, including emotional distress.

## **COUNT V – PRODUCT LIABILITY – DEFECTIVE DESIGN**

228.    All allegations and preceding paragraphs are incorporated herein by reference as if fully set forth herein.

229.    At all times relevant to this Complaint, Defendants were in the business of designing, developing, engineering, manufacturing, refining, researching, fabricating, testing, selling, providing, and/or distributing Scotchgard™ and/or products treated with Scotchgard™.

230.    Defendants had a duty to design their products in a way that would prevent human exposure to toxic chemicals and contamination of the environment.

231.    Defendants breached their duty by, among other acts, negligently and wrongfully designing, developing, engineering, manufacturing, refining, researching, fabricating, and testing Scotchgard™ and thereby failing to exercise reasonable care to prevent Scotchgard™ and its components from posing an unreasonable risk of harm to human health and the environment.

232.    It was foreseeable that PFAS chemicals present in Scotchgard™ that Defendants designed, developed, engineered, manufactured, refined, researched, fabricated, tested, provided, distributed, or sold would contaminate the environment, including water supplies.

233.    It was foreseeable that PFAS chemicals present in Scotchgard™ that Defendants designed, developed, engineered, manufactured, refined, researched, fabricated, tested, provided, distributed, or sold would enter the bodies of Plaintiffs and the Class Members by means of their use of Scotchgard™ during their employment, or via environmental contamination and contamination of their drinking water.

39

234.    Upon information and belief, alternative designs of Scotchgard™ were available, reasonable, technologically feasible and practical, and would have greatly reduced or prevented the harms suffered by Plaintiffs, the Class Members, and the environment.

235.    Defendants' products were defective at the time of manufacture, and at the time they left Defendants' control.

236.    As a direct and proximate result of Defendants' defective design of Scotchgard™, Plaintiffs and the Class Members have suffered damages as set forth below.

## COUNT VI – PRODUCT LIABILITY – FAILURE TO WARN

237.    All allegations and preceding paragraphs are incorporated herein by reference as if fully stated herein.

238.    At all times relevant to this Complaint, Defendants were in the business of designing, developing, engineering, manufacturing, refining, researching, fabricating, testing, selling, providing, and/or distributing Scotchgard™.

239.    Defendants had a duty to provide reasonable instructions and adequate warnings about the risk of injury and the hazardous nature of the product, as well as the harmful effects to human health and the environment posed by Scotchgard™.

240.    Defendants knew or should have known that the distribution, storage, and use of their product, Scotchgard™ would likely contaminate the environment and enter the water supply, harming human health, property, and the environment.

241.    These risks were not obvious to end users.

242.    Upon information and belief, Defendants breached their duties by failing to provide adequate warnings, or any warnings at all, that use of the product could result in PFAS chemicals entering the human body and posing a substantial risk to human health.

243.    Defendants breached their duties by failing to provide adequate warnings, or any warnings at all, that use of Scotchgard™ could result in the contamination of the environment and drinking water.

244.    Sufficient and adequate instructions or warnings would have greatly reduced or avoided the harms suffered by Plaintiffs and the Class Members as set forth in this Complaint.

245.    As a direct and proximate result of Defendants' wrongful actions in failing to provide adequate instructions or warnings for Scotchgard™, Plaintiffs and the Class Members have suffered damages as set forth below.

## COUNT VII – FRAUDULENT CONCEALMENT

246.    All allegations and preceding paragraphs are incorporated herein by reference as if fully set forth herein.

247.    Defendants intentionally concealed and failed to disclose to the Plaintiffs, Class Members, and to the public authorities and/or agencies material facts concerning the extent, nature, magnitude and effects of the exposure to the Plaintiffs and the Class Members and their properties to the toxic substances emitted, released, stored, handled, generated, processed and/or disposed of and maintained in and around the Kent County communities and the surrounding environment.

248.    Defendants intentionally concealed such material information.

249.    Defendants knew or should have known that the Plaintiffs and the Class Members and their properties would be exposed to the toxic substances.

250.    Defendants knew or should have known that the concealment would subject the Plaintiffs and the Class Members to evolving new adverse events from the development of toxic plumes.

251.    Defendants knew of the environmental and health risks posed by PFAS chemicals in Scotchgard™.

252.    Defendants were well aware of the threat that Scotchgard™ posed to human health and the environment at all times relevant to this Complaint.

253.    Despite this, Defendants continued to manufacture, supply, sell, and use Scotchgard™ in a manner that communicated and represented that Scotchgard™ was a safe and effective product.

254.    Defendants intentionally and wrongfully concealed their actions in developing, manufacturing, distributing, selling, and using a product that they knew was harmful to human health and the environment, and that they knew would cause Plaintiffs and the Class Members to incur damages.

255.    Defendants wrongfully concealed their actions in their failure to properly dispose of the toxic chemicals and waste that they had created.

256.    Defendants wrongfully concealed the toxic and hazardous nature of the waste sites that they created and maintained.

257.    If the Plaintiffs and the Class Members who were residents of and/or owned property or drank water in these Kent County communities had known of the material information intentionally concealed by Defendants, the Plaintiffs and the Class Members would not have consented to being exposed to the toxic chemicals.

258.    Plaintiffs and the Class Members reasonably believed that the groundwater, air, soil and environment and natural resources in and around the Wolverine facilities and landfills and their surrounding community did not pose any health hazard.

259.     Plaintiffs and the Class Members had absolutely no reason to suspect that they were being exposed to harmful chemicals in Scotchgard™. The contamination did not alter the taste or appearance of their water, and the resulting human health diseases and disorders are not immediately apparent.

260.     Plaintiffs and the Class Members, therefore, justifiably failed to discover that they possessed causes of action against Defendants until recent water test results revealed the contamination.

261.     Defendants concealed the hazardous nature of Scotchgard™ and the PFAS contamination, which are fundamental and operative facts that form the basis of the causes of action alleged in this Complaint.

262.     At all times, Plaintiffs and the Class Members exercised reasonable and practical due diligence to protect their claims.

263.     Plaintiffs and the Class Members request a Declaratory Judgment stating that Defendants are estopped from raising any and all defenses pertaining to the timeliness of Plaintiffs' and the Class Members' claims.

## COUNT VIII – BATTERY

264.     All allegations and preceding paragraphs are incorporated herein by reference as if fully set forth herein.

265.     Defendants willfully, wantonly and recklessly, generated, discharged, transported, and allowed the release and subsequent migration of toxic chemicals into the environment which caused a direct, harmful and/or offensive contact with Plaintiffs and Class Members and thereby committed battery upon such Plaintiffs and Class Members.

266.     Such wrongful touching and/or contact occurred when such chemicals invaded the bodies of the Plaintiffs and Class Members through their drinking water and the vapor in the air.

267.     Defendants put in motion the chemicals that touched Plaintiffs and Class Members.

268.     Defendants acted willfully and wantonly with reckless disregard that their failure to act to stop the release of such chemicals into the environment would wrongfully cause the touching of Plaintiffs and the Class Members with the toxic chemicals.

269.     Defendants' acts and omissions showed a willful, wanton, and reckless disregard of persons, including the Plaintiffs and the Class Members, who foreseeably might be harmed by such acts or omissions.

270.     The toxic chemical battery of Plaintiffs and the Class Members was offensive and unwelcome.

271.     Plaintiffs and the Class Members did not consent to the wrongful touching.

272.     The Plaintiffs and the Class Members were injured as a result of the toxic chemical battery.

273.     Plaintiffs and the Class Members sustained damages as a result of the toxic battery.

## COUNT IX-UNJUST ENRICHMENT

274.     All allegations and preceding paragraphs are incorporated herein by reference as if fully stated herein.

275.     Defendants knew or should have known that exposure to PFAS was hazardous to human health and the environment.

276.    Defendants knew or should have known that their use of Scotchgard™ and any similar product in the manufacture of shoes, as well as the manner in which they marketed and sold their Scotchgard™ and disposed of the waste and sludge from their manufacture of shoes was hazardous to human health and the environment.

277.    Defendants received a benefit from the manufacture and sale of Scotchgard™ and the shoes containing the Scotchgard™ in the form of profits from the sale of the Scotchgard™ and the sale of the shoes, expenditures that were avoided when they did not develop or invest in Scotchgard™ or water repellent that did not contain toxic chemicals, costs avoided when they did not recall their toxic and dangerous products, and costs avoided by their failure to remediate the impacts of their toxic chemicals.

278.    The Plaintiffs and the Class Members have suffered damages to their persons and property as a result of Defendants' manufacture and sale and disposal of Scotchgard™ and shoes and waste that contained toxic chemicals.

279.    The Plaintiffs and the Class Members have conferred benefit upon the Defendants by virtue of the Defendants' profits and cost avoidance at the expense of Plaintiffs and the Class Members.

280.    Defendants have appreciated the benefits that they received at Plaintiffs' and the Class Members' expense.

281.    Under the circumstances, the Defendants' acceptance and retention of the benefits that they received without paying for the value of the benefits would be unjust and inequitable.

282.    The Defendants wrongfully secured profits and avoided expenses related to the Scotchgard™ and products treated with Scotchgard™ that they sold, and it would be unconscionable for Defendants to retain them.

283.    The Defendants have been unjustly enriched and have injured the Plaintiffs and the Class Members.

### COUNT X- BIOMEDICAL MONITORING AND BLOOD SERUM TESTING

284.    All allegations and preceding paragraphs are incorporated herein by reference.

285.    As a direct and proximate result of Defendants' intentional and negligent acts, as set forth above, Plaintiffs and the Class Members have been exposed to dangerous PFAS chemicals far in excess of normal background levels.

286.    PFAS chemicals, including PFOA and PFOS, are toxic and hazardous substances known to have deleterious effects on human health.

287.    Due to their greater than average exposure to PFAS chemicals, Plaintiffs and the Class Members are at a heightened risk for a variety of diseases and disorders including, but not limited to, kidney cancer, testicular cancer, bladder cancer, colon cancer, prostate cancer, rectal cancer, pancreatic cancer, multiple myeloma, skin cancer, Non-Hodgkin's Lymphoma, leukemia, cardiovascular disease, cerebrovascular disease, osteoarthritis, ulcerative colitis, liver disease, abnormal liver function, increased cholesterol, auto-immune disorders, thyroid disorders and disease, compromised immune response, decreased immune response to vaccinations, pregnancy induced hypertension, developmental delays and disorders, and endocrine and metabolic diseases and disorders.

288.    Early diagnosis and treatment for the cancers, diseases, and disorders caused by PFAS exposure is essential to detect and mitigate long-term health consequences in Plaintiffs and the Class Members.

289.    Simple procedures including, but not limited to, blood serum tests, skin evaluations, scans, urine tests, and physical examinations are well-established and readily available.

290.    These measures are essential to preventing and/or mitigating long-term health consequences that will be borne by Plaintiffs and the Class Members through no fault of their own due to Defendants' actions in exposing Plaintiffs and the Class Members to dangerous chemicals, and, in some cases, these measures are likely to prove life-saving.

291.    The requested tests, procedures, scans, and examinations, are different from the normal recommended medical care and will be specifically tailored to assess and monitor conditions that pertain to PFAS exposure, and they would not be necessary in the absence of a known exposure to these chemicals.

292.    Further, these tests, examinations, and procedures would occur more frequently than the normal recommended schedule of examinations for a population that had not been exposed to these levels of PFAS chemicals.

293.    The requested testing is reasonably necessary and in accord with current medical and scientific procedures.

## COUNT XI – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

294.    All allegations and preceding paragraphs are incorporated herein by reference and as if fully set forth herein.

295.    Defendants knowingly participated in the production, use, and improper transport and disposal of toxic and hazardous chemicals to various sites around Kent County, contaminating the environment, drinking water, and poisoning citizens.

296.     Defendants did not make any attempt to mitigate the contamination or the migration of such contamination, warn citizens of the dangers lurking in their water and environment, and, instead, actively concealed the toxic pollution.

297.     Only through disclosures made in the performance of state and local government investigations were Plaintiffs and the Class Members finally informed that they had been living in the presence of toxic pollution in their water and properties.  Had Defendants notified them earlier, Plaintiffs and the Class Members would have curtailed their consumption of contaminated water.

298.     Defendants' conduct in poisoning the citizens of these Kent County communities and then hiding it is extreme and outrageous.

299.     Defendants operated with intent, and, at the very least recklessness, with regard to the safety of human health and the environment.

300.     Defendants' conduct has caused severe emotional distress among citizens of these Kent County communities, who now live in fear of imminent health problems, the exposure of their families and loved ones to toxic chemicals, and are grappling with the decline in their property values.

### COUNT XII – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

301.     All allegations and preceding paragraphs are incorporated herein by reference as if fully set forth herein.

302.     Defendants knowingly participated in the production, use, and improper transport and disposal of toxic and hazardous chemicals to various sites around Kent County, contaminating the environment, drinking water, and poisoning citizens.

303.    Defendants did not make any attempt to remediate the contamination or warn citizens of the dangers lurking in their water and environment, and, instead, actively concealed the toxic pollution.

304.    Only through disclosures made in the performance of state and local government investigations were Plaintiffs and the Class Members finally informed that they had been living in the presence of toxic pollution in their water and properties.  Had Defendants notified them earlier, Plaintiffs and the Class Members would have curtailed their consumption of contaminated water.

305.    Plaintiffs and the Class Members have witnessed their families and loved ones suffer serious injuries and health problems as a result of consuming water contaminated with toxic PFAS chemicals from Wolverine's tannery and manufacturing processes.

306.    Plaintiffs and the Class Members have endured shock and severe physical distress as a result of witnessing the PFAS-caused illnesses of their family members and loved ones.

## VII.    PRAYER FOR RELIEF

307.   Plaintiffs and the Class Members seek the following relief:

a.   monetary damages for each violation of each Count I through XII, to wit:

   i.   sufficient to remediate Plaintiffs' and the Class Members' property from the contamination caused by Defendants' conduct or in the alternative to compensate Plaintiffs and the Class Members for the diminution in value of their property caused by Defendants' conduct;

   ii.   to compensate Plaintiffs and the Class Members for the loss of use and enjoyment of their properties caused by Defendants' conduct;

      iii. for the Private Well Subclass, for the increased cost to obtain drinking water, including the costs of alternative drinking water sources or the installation and maintenance of an adequate filtration system;

      iv. for the Municipal Water subclass, for the increased cost of water that they have and will bear as a result of Defendants' conduct and;

      v. for such other monetary damages that are required to filly compensate Plaintiffs and the Class Members for the loss of value of their properties caused by Defendants' conduct

b. Plaintiffs and the Class seek injunctive relief, including but not limited to, an order requiring Defendants:

      i. to implement a mandatory testing protocol requiring Defendants to expeditiously test the wells of all Private Well Subclass Members for the presence of PFAS and to continue testing until it is determined that the risk of PFAS contamination in private wells has ended;

      ii. to install permanent filtration devices on any private well testing positive for the presence of PFAS and to maintain those filtration devices pursuant to industry best practices;

      iii. to establish and implement a blood testing program for Plaintiffs and the Class Members;

      iv. to establish and implement a medical monitoring program for Plaintiffs and the Class Members; and

     v.  to take all steps necessary to remediate the affected area such that all municipal and private water supplies of the municipal and private well Plaintiffs and Class Members are free from the presence of PFAS.

c.  an order certifying the proposed Class and Sub-Classes, including the Municipal Water Subclass, the Private Well Subclass, the Non-property owner resident subclass, and the Water Subclass; designating Plaintiffs as the named representatives of the respective Class Members; and appointing their counsel as Class Counsel;

d.  an award to Plaintiffs and Class Members of compensatory, exemplary, and consequential damages, including interest in an amount to be proven at trial;

e.  an award of attorneys' fees and costs;

f.  an award of all such equitable relief as the Court deems proper and just, including but not limited to, an injunction, declaratory relief, disgorgement and a surcharge;

g.  an award of pre-judgment and post judgment interest as provided by law; and

h.  such other and further relief as the Court deems just and proper.

## VIII.   JURY DEMAND

Plaintiffs hereby demand trial by jury pursuant to Federal Rule of Civil Procedure 38(b) of all such issues in this action so triable by right.

Dated: December 1, 2017                Respectfully submitted,

                                */s/ Sharon S. Almonrode*_____
                                E. Powell Miller (P39487)
                                Sharon S. Almonrode (P33938)
                                Kevin F. O'Shea (P40586)
                                Lauren G. Northrop (P69035)
                                THE MILLER LAW FIRM, P.C.
                                950 W. University Dr., Suite 300
                                Rochester, MI  48307

Telephone: (248) 841-2200
epm@millerlawpc.com
ssa@millerlawpc.com
kfo@millerlawpc.com
lgn@millerlawpc.com

Mark J. Dearman
Jason H. Alperstein
Dorothy P. Antullis
ROBBINS, GELLER, RUDMAN AND
DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone: (561) 750-3000
mdearman@rgrdlaw.com
jalperstein@rgrdlaw.com
dantullis@rgrdlaw.com

Robin L. Greenwald
(Pro Hac Vice Application Anticipated)
WEITZ & LUXENBERG, P.C.
700 Broadway
New York, NY  10003
Telephone: (212) 558-5642
rgreenwald@weitzlux.com

Paul F. Novak (P39524)
Diana Gjonaj (P74637)
WEITZ & LUXENBERG, P.C.
Chrysler House
719 Griswold, Suite 620
Detroit, MI  48226
Telephone: (313) 800-4170
pnovak@weitzlux.com
dgjonaj@weitzlux.com

*Attorneys for Plaintiff and the Putative Class*

52